MORTON COLE *v.* CHAMPLAIN TRANSPORTATION CO.

*Book Account.    Contract.    Payment.*

When a certain sum of money is offered by a debtor to his creditor, in payment of a certain bill or account, and the debtor leaves that sum of money and a receipt in full for said account, in the hands of a third person, directing him, in the presence and hearing of the creditor, to deliver the money to the creditor, if he will sign the receipt in full, if not to keep and return the money, and the creditor after the debtor leaves, takes and counts the money, and then refuses to return the money or to sign the receipt, this operates as a full payment or discharge of said bill or account, notwithstanding the creditor declares at the time, that he does not accept the money in full payment of the bill. The same doctrine held in *McGlynn* v. *Billings*, 16 Vt. 329.

One, who had contracted for a quantity of wood, and received the wood, and used it mostly without objection, and then paid for most of it without objection, would after this be precluded from raising either the question of fraud or breach of warranty.

And where the defendants bought a quantity of wood of the plaintiff, which, by the terms of their written contract, was to be placed upon the lake shore and measured by one Boardman, *it was held*, that if the plaintiff properly placed the wood upon the shore, under the contract, it was a waiver of the condition, in the contract, that the wood should be measured and surveyed by B., when the defendants, by their agents, removed and used it.

It was also *held*, that if defendants did not intend to pay for the wood thus placed there under the contract, on the ground that the quality of the wood was infe-

rior to the plaintiff's representations, or for other reasons, it was the business of the defendants to see to it, that their servants did not remove and use it, and that after having allowed them to do so, the defendants must pay for it.

BOOK ACCOUNT. The auditor reported, that in the month of June, 1851, the plaintiff was the owner of a large quantity of wood, then cut and lying on Valcours Island in Lake Champlain. That part of said wood was piled on the east shore of the island on Sloop Bay, so called, and part on the west shore, and a part in the wood and pasture of said island.

That sometime in the month of said June, the plaintiff, and one Oscar A. Burton, the president of the said Champlain Transportation Co., in whose behalf he acts in the transactions herein detailed, and Cyrus Boardman, then in the employ of the said company, and their general wood measurer, met together on said island, and had a conversation about the purchase of said wood by said company. Burton and Boardman then examined the wood on the east side of said island fully; that on the west side not so fully, as some six or eight of the piles were so near together that only the ends and tops of the inside piles could be fully seen without opening them; at this time no contract or purchase was made. That subsequent to this time and prior to the 14th day of July, 1851, the plaintiff took away two sloop-loads of this wood, one of which was on said 14th day of July, at the wharf in Burlington, partly on the wharf, and partly on the boat, and the plaintiff and said Burton again came together and went on to the wharf and boat where said wood then was, and said Burton agreed to take said boat-load of wood at $1,50 per cord, and freight at sixty-two and one-half cents per cord, and said Burton directed the captain of the boat to reload the wood, and take it to Shelburne Harbor, there to be measured by one Root; this was done, and it amounted to 84 cords and 38 feet.

On the said 14th day of July, 1851, the plaintiff sold said Burton a quantity of wood on said island; the contract was in writing, and signed by plaintiff and said Burton; and the quantity in said contract estimated at ten or twelve hundred cords, and described as the same inspected by said Burton and Boardman, some weeks before. The wood was to be measured within a week by said Boardman, and that he might reject two hundred cords of the poorest culled wood, and for the balance said Burton was to pay one dollar and fifty cents per cord. It was also agreed that the

plaintiff might deliver some two or three hundred cords more, out of what the plaintiff had cut, at the same place, and to be of as good quality, said Boardman to be the judge; the wood to be taken away that fall or the next season, as said Burton might elect, and to be paid for when the plaintiff asks, if measured. The wood bought was on Sloop Bay, and the two or three hundred cords named, to be delivered there, if plaintiff elected to deliver it, in addition to the first quantity named.

That the said wood was not measured within the week specified in the said contract, but was postponed, for the accommodation of one party and the other, until the 8th day of August 1851, when said plaintiff and Boardman went on to the island, and measured the wood. The plaintiff claimed that the length was not to be measured, but by the contract to be taken at four feet. But said Boardman measured and adjudged the wood to be three feet and nine inches in length, and computing it at that length, the amount measured and accepted under the contract was 804 cords and 112 feet; calling the length four feet, as claimed by the plaintiff, it amounted to 858 cords and 88 feet. Boardman also measured the wood rejected under the contract as culled wood, and the amount was 184 cords and 50 feet, he also, as part of the 804 cords and 112 feet, accepted and measured 68 cords and 36 feet in the pasture, which the plaintiff agreed to draw to the shore, so that it could be boated away.

The plaintiff also drew from the woods 93 cords and 118 feet of wood, which had not been measured or seen by Boardman or Burton; this wood was of the same quality, as that seen by said Boardman and Burton, when on said island. It was drawn at the same time that the 68 cords were drawn from the pasture, and mixed with it, so that the two could not be distinguished.

The said 93 cords were measured by the plaintiff's men and the boatmen of the defendants, and this wood was taken away by the boatmen in defendants' employ and used by the defendants: but neither the defendants or Burton, or Boardman had any knowledge of this, nor had Boardman been ever called upon to measure or judge of the quality of the wood.

That in October, 1851, the plaintiff and said Burton had a conversation about the purchase for defendants, of the 184 cords and 50 feet of the culled or rejected wood, in which Burton understood

plaintiff as selling him the culled wood at 87½ cents per cord; but on their coming together some eight days after, it appeared that there was a misunderstanding in regard to it, and the trade was abandoned. In the mean time Burton had directed the boatmen to take both the accepted and rejected wood, and under these directions, they had taken away about 60 cords of the culled wood; and that the boatmen of the defendants, had by mistake or otherwise, but without the knowledge of defendants or Burton, taken quantities of the said culled wood, making in the whole of rejected or culled wood taken by defendants, and used by them, about 100 cords.

That the defendants continued to take away the wood, by their boatmen, until sometime in the spring or summer of 1852, when said Burton directed the boatmen not to take away any more of the wood, claiming that the wood was not of as good quality as it was represented to be by the plaintiff, when he purchased it; but did not say anything to the plaintiff on the subject of the quality, or that he had refused to take any more of the wood. At the time Burton gave these directions to the boatmen, there was remaining on said island, of the wood that said Boardman had measured, as aforesaid, about 200 cords, including the balance of the culled wood, after deducting the 100 cords taken away by defendants, as aforesaid.

That after the wood was measured by said Boardman, on the said 8th day of August, 1851, the plaintiff called upon said Burton several times for the pay for the wood; Burton expressed a willingness to pay for the 804 cords and 112 feet, as measured by said Boardman, calling the length three feet and nine inches, but plaintiff declined receiving it, except as for the 858 cords and 88 feet, claiming that as the measurement.

That on the second day of September, 1851, the plaintiff and said Burton, met in Burlington in the room of Judge Noyes, and Burton then made a statement of the account, with a receipt in full, and produced a sum of money and his check, amounting to $1207,40, which money plaintiff proceeded to count. While plaintiff was counting the money, said Burton was called, and informed that the steamboat was about leaving. He then handed plaintiff the account and receipt, and asked him to sign the receipt. The plaintiff said it was time enough to sign the receipt after he had

counted the money. Burton then told Judge Noyes, in the presence and hearing of the plaintiff, to take charge of the money, and if the plaintiff signed the receipt to let him have the money, if not to keep the money, and return it to him. Burton then left for the steamboat. The plaintiff and Judge Noyes continued counting the money, until they were satisfied as to the amount, and Judge Noyes then asked the plaintiff to sign the receipt, written by said Burton. The plaintiff examined the statement and receipt, and refused to sign it, claiming that there was more due him, and that he would not sign a receipt in full; said that he ought to have interest. The plaintiff then wrote a receipt for the money, and offered it to Judge Noyes; but Noyes refused to accept the receipt, and called upon the plaintiff to give him the money, that he might return it to said Burton; plaintiff refused to return the money, or sign the receipt, and took the money away with him. That plaintiff understood that said Burton did not intend that he should take the money away without signing the receipt.

Defendants contended that plaintiff had no right to deliver any wood on the lake shore, under said contract, after said wood was measured by said Boardman, on said 8th day of August, 1851, and that said 93 cords and 118 feet, charged in the account could not be recovered for, in this action.

The auditor decided that defendants are liable for said wood and allowed the 93 cords and 118 feet at $1,50 per cord, amounting to $140,89, and interest thereon.

The auditor also decided that the true amount of wood measured on said 8th day of August, 1851, was 804 cords and 112 feet, and that the defendants are liable for that amount, at $1,50 per cord, amounting to $1207,40, and interest thereon, from the said 8th day of August.

The charge for the 84 cords and 38 feet of wood delivered at Shelburne Harbor, the auditor allowed at $1,50 per cord, making $126,42, and the freight thereon, $52,68, and interest from the 14th day of July, 1851.

The amount of culled wood measured by said Boardman, the auditor found to be 184 cords and 40 feet, and that of this, the defendants took and used 100 cords, as above stated.

The defendants claimed that they were not liable for this wood in this form of action; and plaintiff claimed under the facts stated

Cole *v.* Champlain Transportation Co.

that defendants were liable for the whole 184 cords and 40 feet at $1,50 per cord. The auditor decided that defendants are liable for the 100 cords taken and used for what it was worth, and that its value was 87½ cents per cord, and allowed 100 cords of culled wood at $87,50, and interest from the first day of November, 1851.

| | | |
|---|---|---|
| 1851. Nov. 1, 93 cords and 118 ft. of wood at $1,50 | | 140,89 |
| " Int. from Nov. 1, 1851 to 22 March, 1853 | | 11,76 |
| " Aug. 8, 804 cords and 112 ft. wood at $1,50 | | 1207,40 |
| " Int. from 8 Aug., 1851 to 22 March, 1853 | | 114,69 |
| July 14, 84 cords 38 ft. wood at $1,50 | 126,42 | 179,04 |
| " " Freight on same | 52,62 | |
| Int. from July 14, 1851 to 22 March 1853 | | 18,12 |
| " Nov. 1, 100 cords culled wood at 87½ cts. | | 87,50 |
| Int. from Nov. 1, 1851 to 22 March, 1853 | | 7,29 |
| | | $1766,69 |

| | |
|---|---|
| 1851. Sept. 2, cash paid Cole by Burton | 1207,40 |
| Int. from Sept. 2, 1851, to March 22, 1853 | 112,68 |
| " Oct. 25, cash paid Cole by Burton | 100,00 |
| Int. from Oct. 25, 1851 to 22 March, 1853 | 8,92 |
| | $1429,00 |

Balance in favor of plaintiff                               $337,69

The balance of the plaintiff's claim found by the auditor was $337,69, as above stated, and the auditor disallowed the plaintiff's claims, except as above stated.

The defendants filed exceptions to the report.

The county court, March Term, 1853,—PECK, J. presiding,—overruled the exceptions, and rendered judgment for plaintiff, agreeably to the auditor's report. To which defendants excepted.

*D. A. Smalley* and *Phelps & Chittenden* for defendants.

*Underwood & Hard* for plaintiff.

BY THE COURT. In this case we are inclined to hold, that according to the case of *Mc Glynn* v. *Billings*, 16 Vt. 329, the plaintiff was bound to consider the money, which he received, in full of the bill upon which Burton offered to pay it. It may sometimes

happen that parties may differ, as to whether a certain amount paid is to be received in full of a certain claim, and it may be difficult to determine whether the one or the other party may not have yielded more or less, from their original pretentions; but here there is no reason to raise any question. And as the money did pay the principal, we think very obviously the plaintiff, under the circumstances, cannot now claim a balance of interest, which the auditor has allowed him of $2,01, which must be deducted.

II. As to the evidence to show the quality of the wood inferior to plaintiff's representation, there seems to be two answers.

1. It is not said it was offered to show that the representation was fraudulently made by plaintiff. And treating it as a virtual warranty, and we do not perceive any other view with which it could be offered, such evidence would be to control the written contract, made at the time.

2. The defendants having received the wood, and used it mostly without objection, and then paid for most of it without objection, it would, in any view, be quite too late to raise any question, either of fraud or breach of warranty.

3. As to the ninety-three cords, it came within the written contract, and we do not think the report states any such bad faith or negligence on the part of plaintiff, or his servants, in commingling it with the wood already measured, as to fairly subject the plaintiff to the loss of the wood. And we do not understand by the report, that any portion of the wood formerly measured by Boardman, went to make up this ninety-three cords, but the contrary.

If then the plaintiff properly placed it upon the shore, under the contract, it was a waiver of the condition in the contract, that the wood should be measured and surveyed by B. when the defendants, by their agents, removed it and used it. And if this was done by such agents as they employed to run their boats, and carry wood, and build fires, it will bind them under the circumstances of this case, whether they were boatmen or directors. It was the business of the directors, if they did not intend to pay for the wood, thus placed there under the contract, to see to it, that their workmen did not remove it, and use it, and after having allowed them to do that, the company must pay for it.

4. The same principle will apply to the culled wood. Sixty cords were taken by direction of Burton, while he understood he

was acting under a contract of purchase at $87\frac{1}{2}$ cts., and the other forty by the same workmen, it would seem, before they were made to comprehend the revocation of the first order; so that the whole one hundred cords may fairly be regarded as taken by direction of Burton, upon the same expectation, and the auditor very properly regarded the plaintiff, by charging it on book, as having virtually acceded to the contract, which Burton claimed, and has charged the defendants, with the wood, at the price Burton understood he was to have it for.

5. In regard to the wood carried to Shelburne, we do not see any · possible question. It was received, used and measured by the very man who was to measure it.

Judgment reversed, and judgment on the report for the sum reported deducting $2,01 and adding interest since the judgment in the County Court.