STEWART et al. v. COMMISSIONER OF INTERNAL REVENUE.

No. 231.

Circuit Court of Appeals, Tenth Circuit.

May 18, 1931.

COTTERAL, Circuit Judge, dissenting.

O. L. O'Brien, of Independence, Kan. (W. N. Banks, of Independence, Kan., Walter F. Mehrlich, of Washington, D. C., Banks, O'Brien & McVey, of Independence, Kan., and Hopkins, Starr & Hopkins, of Chicago, Ill., on the brief), for petitioners.

A. H. Conner, Sp. Asst. to Atty. Gen. (G. A. Youngquist, Asst. Atty. Gen., and C. H. Charest, Gen. Counsel, Bureau of Internal Revenue, and De Witt M. Evans, Sp. Atty., Bureau of Internal Revenue, both of Washington, D. C., on the brief), for respondent.

Before LEWIS and COTTERAL, Circuit Judges, and POLLOCK, District Judge.

LEWIS, Circuit Judge.

A. W. Shulthis of Independence, Kansas, died December 29, 1922, leaving a large estate. For the purpose of ascertaining the federal estate tax, his administrators filed with the collector March 12, 1924, the required statement showing the value of the gross estate and the deductions therefrom. The value of certain municipal bonds then held by the Citizens'-First National Bank of Independence, Kansas, was included in the gross estate, and an amount necessary to be paid by Shulthis to the bank to recover those bonds was deducted from the gross estate, the latter amount being in excess of the fair market value of said bonds in the sum of approximately $180,000.00. The Commissioner struck out both items which resulted in his order of a deficiency in the tax to the amount of approximately $23,000.00. The Board of Tax Appeals sustained the action of the Commissioner, and the administrators come here with a petition to review the action of the Board.

Section 402 of the Revenue Act of November 23, 1921 (42 Stat. 227, 278), provides that value of the gross estate of the decedent shall be determined by including the value at the time of his death of all property of every kind to the extent of the interest of the decedent therein, and the following section provides for deducting from the value of the gross estate certain items for the purpose of ascertaining its net taxable value. One of the items thus named is "claims against the estate, * * * as are allowed by the laws of the jurisdiction. * * *"

The issue is whether the amount necessary to be paid by Shulthis to the bank to recover the bonds was a claim against his estate under the laws of Kansas. There is no dispute as to the amount of that item, nor as to the fair reasonable value of said bonds at the time of the death of Mr. Shulthis, which was included in the value of the gross estate in said return. If said bonds were the property of Shulthis at the time of his death they were correctly included in his gross estate, and if the amount required to recover them, which was later paid to the bank for that purpose by the administrators under probate order, was an allowable claim against his estate, that amount was properly deducted from the gross estate in ascertaining its net value for the purpose of the tax.

We must, therefore, inquire whether the bonds were the property of Shulthis at his death. He was president and director of the bank. He was the principal owner and controlled the business policy of three brick companies and a cement company. He was a member of a partnership which did contract work and used brick and cement for paving and other purposes. Other contractors who did like work also used brick and cement made by the companies in which Shulthis was interested. These municipal bonds of the face value of more than $400,000.00 were issued by towns and cities in payment for improvements made of the kind just indicated.

Shulthis took them to the bank about two years prior to his death. He handed them to the auditor of the bank, told him to enter them on the books as bank assets and to give credit for their face value as he then directed. The auditor complied. When other officers of the bank soon thereafter heard of the transaction, they disapproved. Shulthis replied that he was behind everything he put in the bank and that if they did not like his methods he would resign. The board of directors objected. It never gave its approval. The bank examiner criticized the transaction shortly before Shulthis' death, and he told the board of directors and the examiner he would take up the bonds with his private funds. On several previous occasions he made like statements to the board.

In short on the facts of record it appears that Shulthis treated the municipal bonds as his private property when he took them to the bank. They were issued for improvements that had been made, and he plainly was using them to raise the cash necessary to pay for the material and labor. No one else has ever claimed, so far as the record shows, to be the owner of the bonds or disputed Shulthis' ownership. So, the inference that Shulthis was the owner when he took them to the bank, left them there and had the auditor enter them as bank assets and give corresponding credits as he directed seems to unavoidably follow. Unless the transaction, just stated, between Shulthis and the bank's auditor constituted a sale and purchase of the bonds, they were a part of his estate at the time of his death. There has been no claim that anything was said by Shulthis or the bank's auditor about a sale and purchase, nor by the directors or other officers of the bank when the transaction later came to their attention. Their position throughout was that Shulthis had improperly and without authority and their consent put the bonds in the bank and gotten bank's funds on them, and he should take them out which he repeatedly thereafter promised to do. Of course, that meant that Shulthis must reimburse the bank in the transaction he had with the auditor. There was no proof that the auditor had authority to purchase the bonds for the bank. That Shulthis did not intend a sale of the securities to the bank seems clear from his statement made when his attention was at one time directed to the fact that he did not indorse the securities. He gave as his reasons for not doing so that he found it convenient to use them as collateral at other banking institutions. He was indebted to the bank in

a very large amount on promissory notes when he handed the bonds to the auditor, and his evident purpose was to avoid a showing of an increase of that indebtedness on the bank's books. He dominated the board of directors and the bank's other officers and continued to be so indebted until his death.

It is our conclusion that title to the bonds remained in Shulthis, that the bank's interest in them was only that of a lienor for the amount gotten on them by Shulthis when he left them with the auditor, and that he was debtor therefor, which not being paid, became a claim against his estate "as allowed by the laws of the jurisdiction."

But if the conclusion just stated is not sustained by the facts—if the transaction with the auditor constituted a sale of the bonds to the bank—then we conclude from what occurred thereafter Shulthis purchased from the bank and the bank sold to him said bonds, and they again became the property of Shulthis and were a part of his estate at his death for which he had not paid the purchase price. As before stated, when the other officers and directors learned of the transaction with the auditor, they protested and demanded that he take the bonds up. He first put them off, said he was back of everything he put in the bank, but later he promised the board of directors that he would take the bonds up with his personal funds. He died shortly thereafter without doing so. This constituted a sale and purchase if the bonds were not then his property. The Statute of Frauds of the state of Kansas, where all these transactions were held, does not include the sale and purchase of chattels, and such transactions, although resting in parol, are there valid. The English statute provided:

"No contract for the sale of any goods, wares, or merchandise for the price of ten pounds sterling, or upwards, shall be allowed to be good, except the buyer shall accept part of the goods so sold, and actually receive the same, or give something in earnest to bind the bargain, or in part of payment, or that some note or memorandum in writing of the said bargain be made and signed by the parties to be charged by such contract, or their agents thereunto lawfully authorized."

Many of the states have a like statute, but Kansas has omitted this from its Statute of Frauds.

In Leonard v. Davis, 1 Black, 476, 483, 17 L. Ed. 222, the court said:

"When the terms of sale are agreed on, and the bargain is struck, and everything 'the seller has to do with the goods is complete, the contract of sale, says Chancellor Kent, becomes absolute as between the parties, without actual payment or delivery, and the property and the risk of accident to the goods vests in the buyer. He is entitled to the goods on payment or tender of the price, and not otherwise, when nothing is said at the sale as to the time of delivery, or the time of payment. But if the goods are sold upon credit, and nothing is agreed upon as to the time of delivering the goods, the vendee is immediately entitled to the possession, and the right of property vests at once in him. 2 Kent's Com. (9th Ed.) 671; Bradeen v. Brooks, (22 Me. 470); Davis v. Moore, (13 Me. 427).

"Nothing in fact remained to be done in this case, so far as the sale and purchase were concerned. Defendants bought and plaintiffs sold, without condition or reservation, and the measurement was simply to ascertain the amount to be paid by the defendants. Sellers had nothing to do but receive the agreed price, unless the boom-master refused to act, which contingency did not happen in the case. Cushman v. Holyoke, (34 Me. 292); Riddle v. Varnum, (20 Pick. 280).

"It is clear, therefore, that the title in the logs passed to the defendants at the time the contract was executed. Cunningham v. Ashbrook, (20 Mo. 553); Cole v. Transp. Co., (26 Vt. 87)."

See also, Hatch v. Oil Co., 100 U. S. 124, 25 L. Ed. 554. So, whether we regard the transactions between the board and Shulthis, last noted, as a present sale and purchase or only as an executory contract to sell and purchase, Shulthis was liable to the bank for an amount required to take up the bonds, and after his death that amount constituted a claim against his estate "as allowed by the laws of the jurisdiction." Revised Stat. of Kansas 1923, c. 22, art. 7.

While the order of the probate court in which the estate was administered has been subjected to criticism as not being in the usual form of an allowance of a claim against an estate, still it is in substance an allowance of the claim of the bank for the money that Shulthis obtained on the bonds when he left them with the bank's auditor. It directed the administrators to invest the funds of the estate in taking up the bonds, "being certain municipal bonds and obligations held" by the bank, all as set forth in the petition. At the time of Shulthis' death the bonds had depreciated in value to the extent of $180,000.00. The board of directors and the bank's officers, except Shulthis, objected to his putting the bonds in the bank as a means of taking its money. They demanded that he restore what he had gotten and take them out. He promised from time to time to do so, but delayed. He stood in a fiduciary relation to the bank and had imposed on it to its damage. The bank had a claim against him, and in turn against his estate, which it could have enforced. That was the effect of the probate order.

The order of the Board of Tax Appeals is reversed.

COTTERAL, Circuit Judge (dissenting).

The question involved is whether the administrators were entitled to deduct from the gross estate $179,986.87, reached by listing as assets the market value of municipal bonds, $244,414.57, and as a claim against the estate the amount paid the banks for the bonds, $424,401.44. These items were properly eliminated, because Shulthis did not own the bonds at his death, as was required by section 402, Revenue Act of 1921 (42 Stat. 278, 279), and the banks had no claim against his estate, "allowed by the laws of the jurisdiction," as required by section 403 of that act.

The majority opinion justifies decedent's ownership of the bonds on the untenable theories that he did not sell them to the banks, or he later repurchased them from the banks.

Shulthis was president and director of the banks. He was also a stockholder, officer, and director of three brick and cement companies, and a partner in a paving company. Those concerns furnished materials to contractors engaged in constructing municipal improvements, for which bonds were issued, payable from assessments. In order to finance these operations he took over the bonds and lodged them with the banks, instructing the auditor to record them as assets, and credits therefor were given to the contractors and material companies. Shulthis advanced $40,000 to the paving company, and agreed to repurchase from the banks its bonds at par and interest, on demand. Tr. pp. 13, 14, 15. Clearly those bonds were sold to the banks. He did not indorse or guarantee the payment of any of the bonds in writing. The auditor testified Shulthis said the bonds were a good investment for the bank, and at any time the directors so desired he would take them up. Tr. 43. There was no

testimony that aside from the paving bonds he gave the banks any note or evidence of a debt to them, pledged the bonds to the banks, or agreed to pay them any interest on their outlays, which amounted to $480,931.85. However, he indorsed personal notes to the bank for about $1,000,000.

In their petition for review, counsel for the administrators concede that Shulthis was the managing head of the banks and the companies, and that he negotiated the bonds with the banks. Tr. p. 29. In their brief, they make the same statement. Page 3. And the Board of Tax Appeals necessarily found the banks had title to the bonds in stating that Shulthis did not have "such an interest in the bonds that their value should be included in his gross estate," the banks sold some of them to their own customers, and that, though "the transfer to the banks was voidable," no action was taken by the banks prior to his death to set aside such transfers. Tr. p. 24. The alarm of the other directors was due only to the amount of paper Shulthis placed with the banks and not to his authority, and their criticism related to his judgment. Tr. p. 15. He repeatedly stated he was back of anything he put in the banks, and would take it up on demand, and about two weeks before his death told the directors and the examiners he would clean up his personal obligations and write off or handle the others satisfactorily to the banks. But these statements were quite consistent with the title of the banks to the bonds.

It is equally certain he did not regain title to the bonds. As he held a fiduciary relation to the banks, the transactions in its behalf wherein he had a contrary interest were voidable at its election. Morse on Banks and Banking (6th Ed.) § 125a; 2 C. J. 694; 14A C. J. 115. The rule has, however, the qualification that, where the transactions are authorized or ratified, they bind the principal. In this case, they were not only authorized by the banks, but accompanied by an agreement of Shulthis' to be responsible for them. In any event, some affirmative action was necessary to divest the banks of their title to the bonds. This required a rescission and a tender of the bonds to Shulthis, assuming the banks were entitled to adopt that course. 14A C. J. 115. But there was no such action.

Nor was there any valid contract whereby he agreed to repurchase the bonds, except those of the paving company, to the extent of $40,000. His original agreement to be re-sponsible for the other bonds was invalid under the Kansas statute of frauds, because it was not in writing to answer for the debts of the municipalities issuing the bonds by the party to be charged. Rev. St. Kan. 1923, 33—106. Shulthis was the party to be charged. Edgar v. Reeser, 46 F.(2d) 277 (10 C. C. A. Jan. 2, 1931). We need not inquire whether a later contract with the directors to take up the bonds might have been, although oral, a direct undertaking with the banks, and supported by the consideration of forbearance on its part to exact payment. See Williston on Contracts, Vol. 1, §§ 135, 136; 13 C. J. 342, 348, 349; 6 R. C. L. 658, 659. Such a demand of the banks would have survived against the estate. Rev. St. Kan. 1923, 60—3201. And the statute of frauds would have been inapplicable. 27 C. J. 147. But there was in fact no such contract of repurchase, because notice of acceptance of the proposal was wanting. Equitable Life Assur. Soc. v. McElroy (C. C. A.) 83 F. 631. Shulthis offered to take up the bonds. There was only inaction on the part of the banks, and nothing but a satisfactory assurance on his part. The title to the bonds therefore remained in the banks, and the value of them could not properly be included as assets in the return of the administrators.

A deduction of the payment by the administrators to the banks for the bonds was not warranted as a claim against the estate. There were certain proceedings concerning the bonds. The widow and two daughters of Shulthis, his sole heirs, filed a petition in the probate court, reciting he had placed the securities in the bank in financing his companies, and had promised the directors to withdraw them on demand; that the banks held his obligations upon notes for $1,068,389.26 and upon bonds for $437,173.31; that the estate had the cash with which to take them up, and it was just and right to do so; and they prayed an order to pay from the estate the notes, and, if deemed to its best interest, to take up the bonds, in discharge of his obligations. The probate court directed and authorized the administrators to invest the funds of the estate in taking up both the notes and bond obligations. The directors of the banks, by resolution, ratified the transaction, with the right to repurchase some of the bonds it had sold and charge the cost to the estate. Later the estate paid, between December, 1923, and July, 1928, amounts aggregating $424,401.44, to the banks and vendees holding bonds guaranteed to them. The bonds had declined, because of delinquent

municipal assessments, litigation, etc., so that their fair market value was $244,414.57.

Under the laws of Kansas, a claim against an estate must be formally exhibited, and must not be allowed unless the claimant shall make oath in open court or file an affidavit that he has given credit for all payments and offsets, and the claim must be established by competent testimony before it is allowed or adjusted. Rev. St. Kan. 1923, 22—701, 22—705, 22—708, 22—709. By article 33 of Regulation 63 a decision of a local court as to the amount of a claim, even by consent, is accepted. No claim was ever presented by the banks. It is true the probate court found the order to be proper and to the best interest of the estate. But the authorization to the petitioners was not to pay a claim, but to invest the funds of the estate in taking up the bond obligations. There was no claim, as the banks did not rescind the sale of the bonds to them, there was no contract for the resale of them to Shulthis, and the demand of the banks was not embodied in a claim "as allowed by the laws of the jurisdiction." Whether a claim of the banks, if it had been presented, would have been allowed and to what extent was not determined or adjudicated. The conclusion seems unassailable that the payment made by the administrators to the banks was not of a claim which was authorized as a deduction by the Revenue Act of 1921.

In my opinion, the decision of the Board of Tax Appeals should be affirmed.