## CITY BANK FARMERS' TRUST CO. v. BOWERS.

District Court, S. D. New York.
Dec. 1, 1932.

Winthrop, Stimson, Putnam & Roberts, of New York City (William C. Chanler, Henry L. Steitz, and John E. Parsons, all of New York City, of counsel), for plaintiff.

George Z. Medalie, U. S. Atty., of New York City (Frank Chambers, Asst. U. S. Atty., of New York City, of counsel), for defendant.

KNOX, District Judge.

This suit was tried before the court upon an agreed state of facts, and in the absence of the jury. The material facts are these:

Evelyn Bostwick Voronoff, a citizen and resident of France, died at Paris on March 3, 1921. Owning property located within the United States, she made disposition of the same through the medium of an American will, in which Edgerton L. Winthrop, Jr., was named as executor. The document was probated in New York county, and subsequently, upon April 15, 1921, Mr. Winthrop

qualified as executor. He acted as such until his demise upon January 12, 1926. Plaintiff succeeded him in office and continues to act therein.

Mrs. Voronoff, at the time of her demise, owned or had an interest in property within this country to the value of $2,842,639.66, of which $57,284.06 consisted of United States bonds and certificates. In addition, she owned stock in certain American corporations which had a market value of $1,049,060.50. These securities, together with a number of bonds of the republic of France, and worth $65,207.65, were pledged with Farmers' Loan & Trust Company as collateral security for loans which that institution had made to testatrix, and which, in the aggregate, amounted to $557,052.61. Her equity in the pledged American securities, after an appropriate adjustment for the presence of the French bonds, was $527,712.03. Exclusive of the pledged property, the value of the decedent's estate, wherever situated, was $3,278,234.07.

The Commissioner of Internal Revenue, in his determination of the federal inheritance tax upon the estate, included therein the full market value of the pledged stock, viz. $1,049,060.50, and thus found the gross value of decedent's property within the United States to be $3,834,416.10. When account was taken of decedent's property, wherever situated, its gross value was fixed at $4,327,294.57.

Debts and administration expenses of the decedent, other than her indebtedness to Farmers' Loan & Trust Company, amounted to $491,208.57. With the inclusion of this indebtedness, the deductions which it is claimed should be credited against the gross estate, amounted to $1,048,261.18.

The Commissioner, however, in making his tax computation, limited allowable deductions for debts, funeral expenses, etc., to 10 per centum of the gross estate found within the United States, or $383,441.61, as provided by subdivision b (1) of section 403 of the Revenue Act of 1918, enacted February 24, 1919 (40 Stat. 1098). Upon this basis, a tax was paid to Frank C. Bowers, collector of internal revenue, now deceased. Payment was made under protest, and Mr. Winthrop claimed a refund of such portion thereof as, according to his contention, was improperly exacted from him. The claim was rejected, and hence this suit.

At the outset, one item of the claimed refund admits of summary disposition. It relates to a deduction of $11,807, which should be allowed against the gross estate of the testatrix on account of the value of certain household furniture and fixtures which came to her as a share of the estate of Helen C. Bostwick, who had died within five years prior to the decease of Mrs. Voronoff, and upon whose estate the federal estate tax had been duly paid. Defendant now concedes that plaintiff is entitled to this deduction, with the result that, upon this item, plaintiff should receive a refund of $1,889.21.

Turning now to the matters with respect to which the parties are in disagreement, two basic questions present themselves. These are:

(1) Was it proper to include the full value of the stocks pledged with Farmers' Loan & Trust Company in the "gross estate" of decedent?

(2) Was the provision in section 403 (b) (1) of the Revenue Act of 1918, limiting the total allowable amount of deductions to 10 per centum of a decedent's gross estate, constitutional?

The conclusions here to be reached depend upon the manner in which each, or both, of these queries are answered. If the Commissioner of Internal Revenue was correct in answering both questions in the affirmative, plaintiff may recover nothing except the aforesaid sum of $1,889.21. If the first question should be answered in the negative and the second in the affirmative, plaintiff will recover a total amount of $76,362.45. If the first is answered in the affirmative and the second in the negative, plaintiff will recover $87,031.70. If both questions are answered in the negative, plaintiff will recover $89,842.89.

I. Whether the full value of the pledged securities, or only the value of decedent's equity therein, should have been included in her gross estate within the United States, turns upon the correct interpretation of section 402 (a) of the Revenue Act of 1918 (40 Stat. 1097), which provides: "The value of the gross estate of the decedent shall be determined by including the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated—(a) To the extent of the interest therein of the decedent at the time of his death which after his death is subject to the payment of the charges against his estate and the expenses of its administration and is subject to distribution as part of his estate."

In considering the meaning of the words, "to the extent of the interest therein of the decedent," one should bear in mind the pro-

vision in section 403 (a) (1), 40 Stat. 1098, which states that "unpaid mortgages" shall be deducted from the "value of the gross estate" in determining the "value of the net estate." Reading these two sections together, it is apparent that, with respect to mortgaged property, the Congress intended the full value of such property to be included in the gross estate, and that, in arriving at the net value thereof, a deduction commensurate with the "unpaid mortgages" should be allowed. Such was the interpretation which the Treasury Department placed upon similar statutory provisions contained in earlier Revenue Acts. For example, T. D. 2513, July 16, 1917, declared that "mortgages resting on decedent's property should be shown under 'Deductions' and the full value of the mortgaged realty should be shown under item 1 of 'Gross Estate.' A similar rule must be applied with regard to hypothecated personalty."

Again, Mr. Black, in the fourth edition of his work entitled Income and Other Federal Taxes (section 283), states that a like interpretation was applicable to the provisions of the Revenue Act of 1918. His statement is corroborated by the language of article 15 (2) of Treasury Regulation 37, promulgated August 8, 1919, which reads: "The full value of securities pledged to secure a loan should be included in the gross estate. If the decedent had a trading account with a broker, all securities belonging to the decedent held by the broker at the date of death must be included at their market value on that date. Securities purchased on margin for the decedent's account and held by the broker should also be returned at their market value on the day of death. The amount of the decedent's indebtedness to the broker will be allowed as a deduction from the gross estate."

Constructions which thus define the meaning of the phrase, "to the extent of the interest therein of the decedent," are consistent with the nature of a pledge, as defined generally and by the law of the state of New York. As is well understood, a pledge, broadly speaking, is a transfer of the possession of personal property as a security for the payment of a debt or other obligation. The pledgor retains title to the property subject, however, to the right of the pledgee to retain the pledge until the debt for which it stands as security is paid, and, in the event of default in such payment, to sell the property and apply its proceeds to the debt. See Talty v. Freedman's Savings & T. Co., 93 U. S. 321, 23 L. Ed. 886; Warner v.

Fourth National Bank, 115 N. Y. 251, 22 N. E. 172. See, also, 49 C. J. 896, 923. The pledgee acquires no interest in the property except as security for his debt, and his actual interest is purely contingent, in that it depends for effect on something that may or may not occur. Smith v. Savin, 141 N. Y. 315, 36 N. E. 338; Wood v. Fisk, 215 N. Y. 233, 109 N. E. 177. See 49 C. J. 924. The nature of a pledge is no wise disturbed by the death of its pledgor. The pledge then constitutes a part of the pledgor's estate, but it is incumbered by the charge which the decedent imposed upon it. Bell v. Mills (C. C. A.) 123 F. 24; Gillet v. Bank of America, 160 N. Y. 549, 560, 55 N. E. 292. See, also, In re Hallenbeck's Estate, 231 N. Y. 409, at page 412, 132 N. E. 131, 132, in which the court said: "But the title to the stock and testator's right of property therein remained in the pledgor. The pledgee had a lien thereon for the amount of its loan."

In that case, a resident of New Jersey died, leaving a gross estate of over $600,000 in New York. His will was admitted to probate in New Jersey, and ancillary letters testamentary were issued in New York. Twenty-five hundred shares of stock of the appraised value of $142,750 had been pledged by the decedent with a New York corporation, as collateral security for a loan of $150,000. In determining the amount of the taxable estate in New York, the appraisers added the value of the pledged stock to the assets of the estate, and included the debt in its liabilities. It was contended by the executor that decedent's only taxable interest in the stock was his right of redemption, which right was worthless, since the value of the pledged stock was less than the amount of the loan. But the Court of Appeals upheld the appraisers on the ground that the will transferred the shares of stock, and not merely a right to redeem the shares by payment of the debt. The court stated, at pages 412, 413 of 231 N. Y., 132 N. E. 131, 132: "Nor does any reason exist why the pledged stock should not in this case be appraised at its full value. *The indebtedness to the pledgee is an indebtedness against the whole estate, and not against the pledged assets merely.* The ancillary executor is under obligation to pay the domestic debt before he remits the ample assets he finds in New York to the foreign jurisdiction. We may not assume that he will refuse to pay the debt and leave the creditor to enforce its claim against the collateral, or that the stock will be applied to the indebtedness." (Italics mine.)

And, in the case at bar, any assumption

that the executors of Mrs. Voronoff's will would not pay her indebtedness, but would permit the pledgee to realize its debt out of the pledged stock, would have been highly erroneous. This is shown by the fact that her debt was discharged from out the general assets of the estate.

So far, therefore, as concerns the words, "to the extent of the interest therein of the decedent," the Commissioner acted rightly in including the full value of the pledged securities in the "gross estate" of the testatrix. There is no conflict between this conclusion and the line of decisions which hold that, as a basis for an estate tax, the decedent, whose estate is sought to be taxed, must have had an actual beneficial ownership therein, and not merely a bare legal title. Cf. May v. Heiner, 281 U. S. 238, 50 S. Ct. 286, 74 L. Ed. 826, 67 A. L. R. 1244; Reinecke v. Trust Company, 278 U. S. 339, 49 S. Ct. 123, 73 L. Ed. 410, 66 A. L. R. 397; White v. Erskine (C. C. A.) 47 F.(2d) 1014; Frew v. Bowers (C. C. A.) 12 F.(2d) 625. These cases had to do with property held in various forms of trust, and the questions in dispute related to whether or not the settlors of the trusts had reserved beneficial interests therein which were taxable under the statute. But these adjudications have little, if any applicability to a pledge of property such as was made by the testatrix. As has been pointed out, the interest which Mrs. Voronoff had in her pledged securities was real, definite, and specific, and quite different from that of a trustee of a dry trust, who holds but a bare legal title to the subject-matter of the trust. As bearing upon the propriety of the Commissioner's action, in including the full value of Mrs. Voronoff's pledged property as a part of her gross estate, see Stewart v. Commissioner (C. C. A.) 49 F.(2d) 987.

But, says plaintiff, notwithstanding considerations such as the foregoing, a portion of the language contained in section 402 (a) of the statute forbids what the Commissioner did in this particular. Attention is thus directed to the provision of the statute which says that the value of a decedent's gross estate shall be determined by including the value of all property to the extent of decedent's interest therein, "which after his death is subject to the payment of the charges against his estate and the expenses of its administration and is subject to distribution as part of his estate."

As contended by plaintiff, the requirements that a property interest, to be included in a taxable estate, shall be subject to the payment of charges against the estate and the expenses of administration must be taken as they are expressed by the law, in the conjunctive. Crooks v. Harrelson, 282 U. S. 55, 51 S. Ct. 49, 75 L. Ed. 156; United States v. Field, 255 U. S. 257, 41 S. Ct. 256, 65 L. Ed. 617, 18 A. L. R. 1461.

■■ In this connection, it is argued that, due to the rights of the pledgee in Mrs. Voronoff's pledged securities, it is impossible for the taxable interest therein to exceed the value of her equity in the collateral. This contention is not persuasive. It assumes a fixed and unyielding, rather than a contingent and variable right in the securities upon the part of the pledgee. This assumption is contrary to the law as set forth in Re Hallenbeck's Estate and other New York cases cited above. Those cases indicate that the pledgee has no such interest as is assumed by plaintiff until there is a default in the conditions of the pledge. Prior to default, the pledgee has little more than a lien upon the pledged property. It is coupled, of course, with a power of sale conditioned upon the occurrence of the contingency of default. The existence of the possibility of a default is far from an assurance of its occurrence. When there is a recoverable equity in the pledge, the chances of default are so small as to be negligible. The executor of the decedent may, as was done in this case, repay the loan out of other assets in the estate, thus leaving the pledged securities intact, and subject to every condition for which the statute calls. The fact that other assets are used to pay the pledgee does not, as contended by plaintiff, convert those assets into the pledgee's interest in the estate. All that the pledgee receives is the sum which was owed him, and he receives it in money or its equivalent. Such payment is made not by virtue of a property interest which he secures in another specific portion of the decedent's estate, but the payment is made out of the general assets of the debtor, just as in the case of the payment of any general creditor. Plaintiff's argument, if carried to its logical conclusion, would mean that every creditor has such an interest in a decedent's estate that, if the decedent's debts equaled his assets, there would be no gross estate at all. But, in fact, the gross estate in such case might be very considerable, although the net estate would be zero.

Again, I say, the action of the Commissioner, in including the full value of the pledged securities in decedent's gross estate was correct.

II. The second underlying question to be

determined relates to the constitutionality of the provisions in section 403 (b) (1) limiting the allowable amount of deductions to 10 per cent. of that part of decedent's gross estate which was situated in the United States at the time of death.

Defendant raises a preliminary objection to the effect that plaintiff is in no position to urge the unconstitutionality of the statute, in that Mr. Winthrop failed to make such claim in his application for a refund. This objection is without merit. The cases in which courts have refused to allow taxpayers to recover refunds upon reasons not assigned to the Commissioner, have concerned themselves with efforts on the part of taxpayers to set forth new *factual grounds,* as distinguished from legal arguments. Weagant v. Bowers (C. C. A.) 57 F.(2d) 679, 680, cited by defendant, was a case in which the taxpayer failed to set forth in his claim for refund the *facts* with regard to the time of payment of taxes upon which he later based his argument before the court. Similarly, in United States v. Felt & Tarrant Mfg. Co., 283 U. S. 269, 272, 51 S. Ct. 376, 377, 75 L. Ed. 1025, the Supreme Court refused to allow a claim for the repayment of money collected as income and profits taxes, where the papers filed by the taxpayer gave "no notice of the amount or nature of the claim for which the suit is brought, and refers to no facts upon which it may be founded."

Article 99 of Regulations 70, under which the claim for refund in the instant case was filed, provides that "all *facts* relied upon in support of the claim must be clearly set forth under oath." (Italics mine.) It will be observed that the regulation is silent with regard to the assertion of propositions of law. Cf. Henry Prentiss & Company v. United States (D. C.) 46 F.(2d) 159, reversed (C. C. A.) 57 F.(2d) 676.

As for what actually was claimed against the defendant, note may be taken that the application for refund filed December 13, 1926, alleged that "the limitation of the deductions * * * to the sum of $398,440.44 is arbitrary and unjust and not in accordance with the provisions of law." Also the written protest dated December 31, 1923, specified that the tax was "excessive, erroneous, unlawful and unjust and has been assessed and collected in violation of the rights guaranteed to the taxpayer under the law and/or Constitution of the United States * * *" Exhibit C, p. 1. These statements, in and of themselves, are enough to induce me to overrule the objection advanced by de-

fendant to my consideration of the constitutional question.

As previously stated, decedent left a total gross estate of $4,327,294.57, of which $3,834,416.10, or 88.61 per cent. was situated within the United States. The total liabilities, including the loans due to the Farmers' Loan & Trust Company, amounted to $1,048,261.18, of which the sum of $926,864.-16 (88.61 per cent.) was properly allocable as a deduction from the gross estate within the United States, leaving a net estate within the United States of $2,905,551.94, if the 10 per cent. limitation provision is not applied. But, if the deductions be limited to 10 per cent. of the gross estate within the United States, or $383,441.61, the decedent left a taxable estate of $3,450,974.49. From these statements, it will be seen immediately that the application of the 10 per cent. limitation which was here made by the Commissioner, served to increase decedent's taxable estate by more than a half million dollars. The tax thereon was correspondingly raised to the extent of $87,071.70.

What the provision of the statute now under discussion, and which has now been repealed, really accomplished, was a declaration that, as a matter of law, the net estate of a foreign decedent who died leaving property within this country should always be 90 per cent. of the gross estate that was here to be found, and this was to be true in face of the fact that actually the net estate of such decedent might be much less than that percentage of the gross estate. The case at bar is an excellent example of this result. Any such arbitrary fixation of high percentages in the valuation of estates for the purposes of taxation necessarily means that sooner or later the tax must fall not only upon the net estate of a decedent, but upon the value of his gross estate as well. This is so notwithstanding that the intent of the statute was that the tax should fall only on net estates. As to decedents not situated in a position like unto that of the testatrix, and irrespective of whether such decedents were or were not nonresidents having property here, the tax would be an incidence only of the net value of their estates. The limitation clause therefore creates a situation whereby a tax that is discriminatory, and which falls upon her gross estate, is imposed upon the estate of Mrs. Voronoff. Defendant seeks to justify the result on the theory that Congress may reasonably place residents and nonresidents in different categories for the purposes of taxation. By virtue of the

decision in Maxwell v. Bugbee, 250 U. S. 525, 40 S. Ct. 2, 63 L. Ed. 1124, concession must be made that under appropriate circumstances, a theory such as this is not open to valid objection. But the fact here present is that the differentiation which is brought about by the 10 per cent. limitation, is not one between residents and nonresidents of the United States. It exists between some nonresidents and other nonresidents. Furthermore, the degree of discrimination increases in direct proportion to the *debts* of the nonresident decedent. And thus it comes to pass that an estate may be taxed, not according to its actual net value, but upon the basis of the amount of the indebtedness of a decedent. In other words, the taxation to which the estate is subject varies not with its assets, but with its liabilities. Stating the matter still differently, the tax to be paid is measured by the aggregate of the claims of creditors rather than by the net value of the estate. The following illustrations will make this clear: Assume a tax rate of 20 per cent., and the rule, not controverted here, of allocating deductions in that proportion which the gross estate in the United States bears to the total gross estate, wherever situated. If a nonresident decedent leaves a gross estate of ten million dollars of which property to the value of five million dollars is situated in the United States, and there is a total of a million dollars in liabilities, the net estate in the United States would be four and one-half millions. The tax thereon would be $900,000, or 20 per cent. of that net estate. If, however, the total debts amounted to five million dollars, the net taxable estate, under the 10 per cent. limitation class, together with the amount of the tax, would be exactly the same as in the case just supposed, despite the fact that the actual net assets of the estate in the United States, did not exceed $2,500,000.

In terms of economic actualities, therefore, a net estate of two and one-half million dollars would be taxed at the rate of 36 per cent. This means that the rate of taxation was augmented to the extent of 16 per cent. by reason of the fact that the liabilities of the estate in one instance were five times as great as in the other. Finally, if it be assumed that the total debts of the supposititious estate amounted to ten million dollars, the amount of the tax under the limitations of the statute would still be $900,000, although there would be no net estate, and although, as a result, there could be no transfer of property to decedent's heirs or legatees. This likewise would be true notwithstanding that the imposition of the tax would render the estate insolvent. If imposed, the tax could not do otherwise than fall upon the creditors holding claims against the estate.

That the legislation under which results such as the above might ensue was arbitrary, unfair, and capricious is made apparent by comment in the Congress at or about the time of repeal of the provision in question. House Report No. 2, of the Seventieth Congress, First Session, contained the following illuminative language: "This limitation imposes substantial hardship. For example, the attention of the committee was brought to a case of a non-resident whose gross estate situated in the United States was valued at $600,000, but his outstanding debts amounted to $400,000. Because of this limitation he was permitted a deduction of only $60,000, whereas in fact the deduction, in all fairness, should have been $400,000. Accordingly the committee recommends that this limitation be removed." See, also, Senate Report 960, at page 33, on the same bill.

But, granting all that has been said, was the 10 per cent. limitation clause in contravention of the Constitution of the United States? The decisions of the Supreme Court in Heiner v. Donnan, 285 U. S. 312, 52 S. Ct. 358, 359, 76 L. Ed. 772, Hoeper v. Tax Commission, 284 U. S. 206, 52 S. Ct. 120, 76 L. Ed. 248, and Schlesinger v. State of Wisconsin, 270 U. S. 230, 46 S. Ct. 260, 70 L. Ed. 557, 43 A. L. R. 1224, would seem to require an affirmative answer. See, also, Quaker City Cab Company v. Com. of Pennsylvania, 277 U. S. 389, 48 S. Ct. 553, 72 L. Ed. 927.

In the Schlesinger Case, the court held a Wisconsin statute which set up a conclusive presumption that all material gifts made within six years of a decedent's death were made in contemplation of death, thus subjecting such gifts to graduated inheritance taxes without regard to decedent's actual intent in making the gifts, to be violative of the Fourteenth Amendment, because it created an arbitrary classification. In the Hoeper Case, a Wisconsin income tax statute was also held to be void as contrary to the due process and equal protection clauses of the Fourteenth Amendment, because it authorized the assessment of a tax against a husband upon computation made on the combined total of his wife's and his own incomes, and augmented the same by surtaxes based upon the combined incomes, although under the laws of Wisconsin the husband had no interest in or control over the property or income of his wife. Finally, in Heiner v. Donnan, the court held the Fifth Amendment

to be vigorous enough to invalidate the presumption clause contained in section 302 (c) of the Revenue Act of 1926 (26 USCA § 1094 (c), just as the Fourteenth Amendment had sufficed to overthrow a similar presumption that was included in the tax statute of the state of Wisconsin.

In the decision in Heiner v. Donnan, the court gave the following reasons for holding the statute unconstitutional:

(1) The clause creating a conclusive presumption that gifts made within two years prior to the death of the donor were made in contemplation of death cannot be sustained as a death transfer tax because such a gift, when not in fact made in contemplation of death, does not pass "from the dead to the living," because death, in such case, is not "the generating source from which the particular taxing power takes its being," and "does not result in a shifting, or in the completion of a shifting, to the donee of any economic benefit of property, which is the subject of a death tax."

(2) The Schlesinger Case held that "a statute which imposes a tax upon an assumption of fact which the taxpayer is forbidden to controvert is so arbitrary and unreasonable that it cannot stand under the Fourteenth Amendment."

(3) The Hoeper Case laid down the rule that "any attempt by a state to measure the tax on one person's property or income by reference to the property or income of another is contrary to due process of law as guaranteed by the Fourteenth Amendment."

(4) "The restraint imposed upon legislation by the due process clauses of the two amendments [the Fifth and the Fourteenth] is the same. * * * That a federal statute passed under the taxing power may be so arbitrary and capricious as to cause it to fall before the due process of law clause of the Fifth Amendment is settled."

(5) "The provision in question cannot be sustained as imposing a gift tax, (1) because the intent of Congress to enact the provision as an incident of the death tax and not as a gift tax is unmistakable; and (2) because,

if construed as imposing a gift tax, it is in that aspect still so arbitrary and capricious as to cause it to fall within the ban of the due process clause of the Fifth Amendment," for the reason that it is "a contribution to the government exacted of one person [the beneficiary] based pro tanto upon the wealth of another [the donee of the gift]."

Each and all of these reasons apply with telling force against the 10 per cent. limitation now under attack.

(1) The tax to be paid is measured by the value of property which will go to creditors of the estate rather than to beneficiaries of the decedent. The only "economic benefit" which, under any circumstances, can be shifted to the beneficiaries as the result of the death of a testator, is the net estate of the decedent.

(2) A limitation provision, imposing a tax upon an incontrovertible assumption that the value of decedent's net estate was 90 per cent. of its gross value when contrary to the fact, is capricious, untenable, and void.

(3) The tax upon the decedent's estate is measured by reference to the claims of creditors of the estate, and, as such, is contrary to due process of law, according to the Hoeper Case.

(4) The provision in question is found in a federal statute. As such, it is subject to the restraint of the Fifth Amendment, just as a capricious and unreasonable state statute may be restricted by the limitations of the Fourteenth Amendment to the Constitution.

(5) The limitation provision of the statute is not sustainable upon the theory that it is not essentially an estate tax. It is part and parcel of a statute of that character, and nowhere in the act is there anything which justifies a contrary view.

Without prolongation of the argument, question II, hereinbefore propounded, will be answered in the negative. It follows that plaintiff should have judgment against defendant in the sum of $87,031.70, with interest from December 31, 1923.